#24414-rev & rem-JKM

**2008 SD 20**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

MELISSA J. (BARTLETT) KAUTH,                    Plaintiff,

v.

LEE O. BARTLETT,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
SPINK COUNTY, SOUTH DAKOTA

* * * *

HONORABLE TONY PORTRA
Judge

* * * *

MELISSA J. (BARTLETT) KAUTH
Redfield, South Dakota                    Pro se plaintiff.

CARL J. KOCH
Mitchell, South Dakota                    Attorney for defendant
                    and appellant.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 27, 2007
REASSIGNED DECEMBER 20, 2007

OPINION FILED **03/12/08**

#24414

MEIERHENRY, Justice (on reassignment).

[¶1.]    Lee O. Bartlett (Bartlett) petitioned to modify his child support obligation after relocating and reducing his income. Even though the child support referee found that Bartlett did not leave his employment for the purpose of reducing his child support obligation, the referee's report set child support based on the imputed income from Bartlett's prior job. The circuit court's order adopted the referee's report. Bartlett appeals. We reverse and remand.

## FACTS

[¶2.]    When Bartlett and Melissa Kauth (Kauth) divorced on November 30, 2004, Bartlett's monthly child support obligation for their two children was set at $730.00 based on his gross annual income of $37,600.00 as a funeral home director in Redfield, South Dakota. Bartlett remarried in June of 2006. His new wife lived and worked in Harrisburg, South Dakota. She attempted to relocate and find employment in Redfield but was unable to do so. Bartlett quit his job at the funeral home in Redfield to move to Harrisburg, South Dakota. He obtained employment as a pizza restaurant manager making a gross annual income of about $18,000.00.

[¶3.]    In April of 2006, Bartlett petitioned for reduction of his child support obligation because of his lower income. Bartlett requested a deviation under SDCL 25-7-6.10(2) based on his financial condition. Melissa Kauth did not specifically request an upward deviation. At the hearing, Bartlett appeared by telephone, and Kauth appeared in person. Neither party was represented by counsel. At the beginning of the hearing, the referee questioned Bartlett about leaving his job as a funeral home director for a less stressful career as follows:

-1-

> Referee: Why did that job [as funeral home director] end?
> Bartlett: I decided on a different career.
> Referee: So did you voluntarily quit?
> Bartlett: Yes, I did.
> Referee: Ordinarily, sir, if someone's income decreases as a result of their voluntary actions, in a child support proceeding we treat them as though they still had that same income. Can you tell me any reason, sir, why that should not be the case in this proceeding?

Bartlett briefly explained that he was unable to find employment as a funeral home director after relocating to Harrisburg, South Dakota. He also explained that his job as a funeral home director was very stressful and that the job had a high turnover rate. The referee denied Bartlett's request to reduce the support and imputed Bartlett's prior gross monthly income of $3,133.00 for purposes of calculating child support. Based upon the imputed income, the referee calculated Bartlett's child support obligation at $697.00, plus $85.00 per month for his pro rata share of health insurance, increasing the total support obligation from the prior order of $730.00 to $782.00 per month.

[¶4.] Bartlett retained counsel and objected in circuit court to the referee's report. The circuit court remanded the matter to the referee "for the sole and limited purpose of conducting further hearing on the specific and limited issue of whether Lee O. Bartlett voluntarily reduced his income for the intent and purpose of manipulating (i.e. reducing) his child support obligation."

[¶5.] On remand, Bartlett was represented by counsel and Kauth appeared pro se.[1] Bartlett presented evidence that part of his decision to relocate and switch

---

1. Kauth did not submit a brief in this matter.

jobs was because of the stress of the funeral business and the extended hours he had to work. The referee noted that "[t]he mother did not request deviation based on the father's voluntary reduction of his income." Nevertheless, the referee determined that he had broad authority to raise deviations on his own and entered only one finding of fact as follows:

> [Bartlett] admits he voluntarily quit his job. There was no evidence that he did so with the express intent of reducing his income. The Referee would point out, however, that he did not make any such finding in his original report either. . . .

The referee went on to conclude that "[w]hether [Bartlett's] intent in quitting his job was to reduce his child support obligation or not is irrelevant."

[¶6.]    Bartlett had requested a deviation based upon his financial condition pursuant to SDCL 25-7-6.10(2). This deviation presumes a financial hardship if the child support amount constitutes over fifty percent of the obligor's net income. Although the evidence showed that Bartlett's child support amount exceeded fifty percent of his actual net income, the referee made no finding on the deviation except to conclude Bartlett had waived it. The referee again imputed Bartlett's prior income and recommended a monthly support amount of $782.00.

[¶7.]    Bartlett once more objected to the referee's recommendation because the referee had deviated from the child support schedule based upon a deviation neither party had requested and because the referee had automatically imputed Bartlett's prior income. The circuit court adopted the referee's findings of fact and conclusions of law as set forth in the referee's reports from the original hearing and the remand. Bartlett raises the following issues on appeal:

## ISSUES

1. Whether the circuit court erred in adopting the referee's calculation of child support using Bartlett's imputed income.
2. Whether a child support referee has authority to raise a deviation sua sponte.

## STANDARD OF REVIEW

[¶8.]     We review the decision to grant or deny child support under the abuse of discretion standard. Miller v. Jacobsen, 2006 SD 33, ¶18, 714 NW2d 69, 76 (citing Midzak v. Midzak, 2005 SD 58, ¶17, 697 NW2d 733, 738 (additional citations omitted)). When reviewing a child support referee's findings of fact, we review for clear error, while conclusions of law are reviewed de novo. Wagner v. Wagner, 2006 SD 31, ¶5, 712 NW2d 653, 656 (quoting Mathis v. Mathis, 2000 SD 59, ¶7, 609 NW2d 773, 774). Additionally, when the lower court adopts the child support referee's factual findings and legal conclusions, "we apply the clearly erroneous standard of review to the findings and give no deference to conclusions of law." *Id.* Findings are not reversed for clear error "unless we are left with a definite and firm conviction a mistake has been made." *Id.*

[¶9.]     Issues regarding statutory interpretation are questions of law reviewed de novo. Rotenberger v. Burghduff, 2007 SD 7, ¶8, 727 NW2d 291, 294 (quoting State v. $1,010 in Am. Currency, 2006 SD 84, ¶8, 722 NW2d 92, 94). "Statutes are to be construed to give effect to each statute [ ] so as to have them exist in harmony. It is a fundamental rule of statutory construction that the intention of the law is to be primarily ascertained from the language expressed in the statute." Huber v. Dep't of Pub. Safety, 2006 SD 96, ¶14, 724 NW2d 175, 179

(quoting *$1,010 in Am. Currency*, 2006 SD 84, ¶8, 722 NW2d at 94 (citing *In re*

*Estate of Meland*, 2006 SD 22, ¶6, 712 NW2d 1, 2) (additional citations omitted)).

## DECISION

### *Child Support Calculated on Actual, Not Imputed Income*

[¶10.]     The referee and the circuit court misapplied and misinterpreted the

statutes and prior case law by automatically imputing Bartlett's previous wages.

The referee and the circuit court applied a bright-line rule that if an obligor

voluntarily takes a job that pays less than his prior job, his higher income from the

prior job, must be imputed and used to calculate child support under the schedule.

Neither the statutes nor our prior opinions support such a bright-line rule.

[¶11.]     The statutory scheme in SDCL Chapter 25-7 governs child support

calculations.  The language of the statutes does not authorize automatically

imputing a higher income when someone voluntarily takes a lower paying job.  The

only statute that even refers to imputed income is SDCL 25-7-6.4, which merely

creates a rebuttable presumption that a parent is *capable* of being employed at

minimum wage.[2]  Since Bartlett's income exceeded minimum wage this statute does

not apply.

[¶12.]     In all other cases, such as Bartlett's, the child support schedule uses

an obligor's actual monthly net income as determined by SDCL 25-7-6.3 (income

---

2.     SDCL 25-7-6.4 provides as follows:
       Except in cases of physical or mental disability, it shall be presumed for the
       purposes of determination of child support that a parent is capable of being
       employed at the minimum wage and his child support obligation shall be
       computed at a rate not less than full-time employment at the state minimum
                                                                    (continued . . .)

included in monthly gross income) and SDCL 25-7-6.7 (allowable deductions). A proper application of the statutes in this case would require calculating Bartlett's monthly net income based on his actual earnings. The monthly net income of the parties is then combined to determine the support obligation under the schedule set forth in SDCL 25-7-6.2. Only after this schedule calculation has been performed may a deviation, as set forth in SDCL 25-7-6.10, enter into the child support obligation equation.

[¶13.]     Thus, the statutes lay out a procedure wherein the initial step is to determine the current net income of the parties and scheduled support amount. Then, any requested deviations can be considered. We addressed the mandatory nature of the procedure in *Midzak v. Midzak*, 2005 SD 58, 697 NW2d 733 and *Gisi v. Gisi*, 2007 SD 39, 731 NW2d 223. In *Midzak,* the trial court failed to order child support. We reversed and remanded pointing out that "[t]he trial court is required to calculate the parents' monthly net income . . . as codified at SDCL 25-7-6.3 and 25-7-6.7." *Midzak,* 2005 SD 58, ¶30, 697 NW2d at 740. We noted that "[d]eviations from the support obligation schedule at SDCL 25-7-6.2 are possible, but must be raised by the parties in order to be considered by the trial court." *Id*. ¶30, 697 NW2d at 741. However, in order to even reach the possibility of a deviation, the referee must first compute the child support pursuant to SDCL 25-7-6.2 using the parent's **current income**. In *Gisi,* we said the child support schedule statutes

_____

(. . . continued)
        wage. Evidence to rebut this presumption may be presented by either
        parent.

require the trial court to calculate the monthly net income of the obligor first, based upon the obligor's current income, and only after this calculation is made, may the deviations in SDCL 25-7-6.10 be applied. 2007 SD 39, ¶¶7-8, 11, 731 NW2d at 226-27.

[¶14.] The father in *Gisi*, asked for a downward deviation because he was incarcerated and had no income. The mother had not argued for an upward deviation. The referee and the court miscalculated the father's obligation by using an imputed gross minimum wage rather than a monthly net income. We determined that a proper calculation under the schedule set the father's obligation at $100.00 rather than the $190.00 ordered by the court. Neither the referee nor the court entered findings supporting a deviation. We found it was error for the referee to "merely impute" the father's prior income.

[¶15.] Here, the referee and the circuit court failed to follow the procedures mandated by statute and articulated by this Court in *Gisi*. *See* 2007 SD 39, ¶7, 731 NW2d at 226. In this case, like in *Gisi*, the referee and the circuit court incorrectly considered a deviation without first calculating support. Clearly, this backwards application of the statutory deviation scheme is not contemplated by the statutes.

[¶16.] However, it is apparent from the record that the referee did not consider the higher imputed income as a deviation. In the first recommendation, the referee entered findings that Bartlett had waived his request for a deviation and Kauth had not requested a deviation. On remand from the circuit court, the referee again did not consider the imputed higher income as a deviation. Nevertheless, the referee alternatively found that if imputing the higher income was considered a

deviation, then the referee had authority to raise the deviation sua sponte to sustain his recommended support amount. The referee, however, failed to enter specific findings based upon the deviation factors in SDCL 25-7-6.10 and failed to consider the deviation factor raised by Bartlett. The referee's one finding was that "Bartlett admitt[ed] he voluntarily quit his job," but did not quit "with the express intent of reducing his income."[3]

### *Referee Cannot Raise Deviations Sua Sponte*

[¶17.] Bartlett argues that the referee erred when he alternatively considered the deviation without either party raising the issue. The statute, SDCL 25-7-6.10, allows for a deviation as follows:

> Deviation from the schedule in § 25-7-6.2 shall be considered if raised by either party and made only upon the entry of specific findings based upon any of the following factors:
> (1) The income of a subsequent spouse or contribution of a third party to the income or expenses of that parent but only if the application of the schedule works a financial hardship on either parent;
> (2) Any financial condition of either parent which would make application of the schedule inequitable. If the total amount of the child support obligation, including any adjustments for health insurance and child care costs, exceeds fifty percent of the obligor's monthly net income, it shall be presumed that the amount of the obligation imposes a financial hardship on the obligor. This presumption may be rebutted based upon other factors set forth in this section;
> (3) Any necessary education or health care special needs of the child;
> (4) The effect of agreements between the parents regarding extra forms of support for the direct benefit of the child;
> (5) The obligation of either parent to provide for subsequent natural children, adopted children, or stepchildren. However,

---

3. Even if a referee had inherent power to raise a deviation sua sponte, here the referee's one finding in support of the deviation was insufficient to support the amount of the deviation.

> an existing support order may not be modified solely for this reason; or
>
> (6) The voluntary act of either parent which reduces that parent's income.

Pointing to the statutory language, "if raised by either party," Bartlett claims that a deviation from the child support schedule cannot be considered unless a party raises the issue.

[¶18.] We agree with Bartlett that the referee may not raise a deviation sua sponte. The statute directs that "[d]eviation from the schedule in § 25-7-6.2 shall be considered if raised by either party." SDCL 25-7-6.10. The statute contemplates that the parties would raise deviations. There is no authority to support the premise that a child support referee has inherent authority to raise a deviation on his own. Gleaning such authority from SDCL 25-7-6.2 is dubious. The language of the statute neither authorizes nor prohibits a referee or court from considering a deviation sua sponte. The plain and simple statutory meaning merely requires the referee and/or the court to consider and enter specific findings if a party raises a deviation request.

[¶19.] The referee relied upon the broad equitable standard of "best interest of child" as giving him inherent authority to raise deviations sua sponte. The referee referred to this as "an affirmative duty to protect children even against the wishes or arrangements of parents." The referee's reliance on this standard is misplaced. The "best interest of the child" standard is not a standard articulated in the child support statutes. SDCL ch 25-7. The guiding standard for child support is the child's "standard of living" pre-divorce and the child's actual needs. SDCL 25-7-6.2; Laird v. Laird, 2002 SD 99, ¶30, 650 NW2d 296, 301. The court's broad

equitable power to set child support has long been replaced by the mandatory child support statutes, the goal of which is to establish uniformity. Report of the South Dakota Commission on Child Support 13 (Dec. 1985) ("The lack of uniform support guidelines in the State has led to substantial variations in the amount of support ordered to families in similar situations. The support obligation ordered oftentimes varies depending on the method used in determining what the support obligation should be.").

[¶20.]     Prior to enactment of mandatory child support schedules, the courts were guided by "the [child's] necessary maintenance, education and support" and the parent's "respective means." SDCL 25-7-7 (1982), *amended by* 1986 SD Sess. Laws ch 218, section 11, *repealed by* 1989 SD Sess. Laws ch 220, section 19. The 1982 statute made "the parents of a child jointly and severally obligated to provide the necessary maintenance, education, and support of the child in accordance with their respective means." Saint-Pierre v. Saint-Pierre, 357 NW2d 250, 259 (SD 1984). In interpreting the 1982 statute, this Court applied several factors and set two explicit standards courts were to apply in determining child support. We stated, "The amount of child support depends upon the reasonable needs of the child, i.e., the reasonable expenditures suitable to the child's circumstances at the time of the divorce and the payor's financial situation." Gross v. Gross, 355 NW2d 4, 7 (SD 1984) (citations omitted). We instructed the lower courts to determine (1) an amount which would support the child's circumstances and situation in life; and (2) obligor's ability to pay. *Id.* Thus, even before the mandatory schedules were enacted "the best interest of the child" was not the standard for child support

determinations. *See* SDC 183 (1929) (requiring "support and education suitable to his circumstances"); *see also* SDCL 25-7-7 (1982) (requiring support "in accordance to their respective means"), *amended by* 1986 SD Sess. Laws ch 218, section 11, *repealed by* 1989 SD Sess. Laws ch 220, section 19.

[¶21.]     Since 1986, the legislature has established mandatory child support guidelines. 1986 SD Sess. Laws ch 218, section 11. In interpreting the 1986 version of the law, we determined that the statutes required courts to impose the guidelines and consider the deviation factors in every case. We said in *Bruning v. Jefferies*, "The question becomes whether Secretary (and hearing examiner) must consider these [deviation] factors in every case he hears. We conclude, from a reading of this statute in its entirety, that the legislature intended that these [deviation] factors be considered in each proceeding." 422 NW2d 579, 580 (SD 1988). Because the hearing examiner "chose not to consider any of the deviations" we reversed. *Id.* Even though the legislature later amended the statutes only to require consideration of the deviation factors raised by the parties, 1989 SD Sess. Laws ch 220, section 10, it still required uniform application of the guidelines. 1989 SD Sess. Laws ch 220, section 2. The 1986 statutory scheme and all subsequent amendments to the child support guidelines demonstrate a clear legislative intent to make the statutory procedures mandatory.[4]

---

4.     Although the legislature repealed SDCL 25-7-7 in 1989, SDCL 25-7-7 (1986), *repealed by* 1989 SD Sess. Laws ch 220, section 19, the mandated child support guidelines continued with a newly adopted child support schedule, codified under SDCL 25-7-6.2. In the repealed language of SDCL 25-7-7 the legislature clearly provided that "[t]hese guidelines *shall be used* in setting child support." SDCL 25-7-7 (1986) (emphasis added), *repealed by* 1989 SD

(continued . . .)

### *Parties' Responsibility to Request Deviations*

[¶22.]     As part of the statutory scheme, child support hearings under SDCL 25-7A-22 give parents an opportunity to request a change in child support without a formal circuit court proceeding.  Even though the referee hearing may be less formal and the parties usually appear pro se, the referee must conduct the proceeding in a fair and impartial manner.  Additionally, when referees or courts interject issues not raised by either party, they run the risk of losing their neutrality and becoming advocates for a party, if not in fact, then in appearance.  The referee as an arm of the court cannot be an advocate for either party.  *See* SDCL 25-7A-6 (a referee "is a member in good standing of the State Bar Association and is appointed by the court, pursuant to statute").  A referee or court that raises an issue sua sponte may compromise its position as a fair and impartial adjudicator.[5]

[¶23.]     Whether to request a deviation with supporting evidence is the responsibility and decision of each party.  SDCL 25-7-6.10.  In Bartlett's original petition for modification of child support Bartlett requested a deviation from the support schedule because of his financial condition pursuant to SDCL 25-7-6.10(2).

_____

(. . . continued)

> Sess. Laws ch 220, section 19.  The mandated child support guidelines continued with a new child support schedule codified under SDCL 25-7-6.2 (1989).  The current version of SDCL 25-7-6.2 states:  "The child support obligation *shall be established in accordance with the following schedule. . . .*" (Emphasis added).

5.     A better approach for a referee is one we have seen in other cases where the referee goes through each statutory deviation on the record and canvasses the pro se litigants as to whether they wish to raise any of them.

Kauth, on the other hand, did not initially request a deviation. However, during the referee hearing upon remand, Kauth, appearing pro se, argued for a deviation. While she did not specifically say "deviation," she did argue for one as follows:

> [T]he law states that if you voluntarily quit your job, whether it's to reduce, purposely reduce child support or not, that you're still responsible for the prior initial setup of child support. . . . I know that it's tough to make things meet now that he doesn't pay the child support when he use[d] to. I pay my rent a month late because I only make $15,000 a year, so it doesn't spread very well. It's very thin.

This statement constitutes an effective request for deviation. Additionally, the parties clearly litigated the issue in the various hearings during the course of the proceedings. Thus, the statutory requirement of being "raised by either party" was met. The referee was presented with the father's request to reduce his child support and the mother's request that it remain the same because the father voluntarily reduced his income. Nevertheless, the referee failed to consider the deviations as contemplated by the statutes and failed to enter sufficient findings as to the deviations.

*Conclusion*

[¶24.]    We hold that the circuit court erred in adopting the referee's report because the referee incorrectly applied the child support statutes by initially using the imputed prior income of Bartlett to calculate support and by not considering the deviation factors properly. We reverse and remand.

[¶25.]    GILBERTSON, Chief Justice and KONENKAMP and ZINTER, Justices, concur.

[¶26.]    SABERS, Justice, concurs in result in part and dissents in part.

SABERS, Justice (concurring in result in part and dissenting in part).

[¶27.]     I agree with the majority opinion's determination that the parties raised the issue of deviation and therefore, the referee could consider a deviation. However, I disagree that the statute itself limits consideration of a deviation only to instances where a party raises the issue of a deviation. Admittedly, some of our prior case law suggested a deviation can only be considered if a party raises it. *See Wagner*, 2006 SD 31, ¶9, 712 NW2d at 657 (noting the statute "only allows a referee to address deviations when one has been 'raised' by a party *and* only upon the entry of specific findings following the hearing"); *Midzak*, 2005 SD 58, ¶31, 697 NW2d at 741 (noting neither party raised the issue of deviation, nor did the court enter specific findings on any of the statutory factors in SDCL 25-7-6.10). However, these cases only consider the issue in dicta and it has not been thoroughly analyzed. In the prior cases, the trial courts did not make the requisite findings of fact in order to deviate from the schedule. It is difficult to determine from the prior cases whether the failure to make specific findings was the determinative reason to deny a deviation. Regardless of the prior cases, this issue has not been squarely raised until now.

[¶28.]     In determining the legislative intent of a statute, "[w]e give words their plain meaning and effect, and read statutes as a whole, as well as enactments relating to the same subject." Rotenberger v. Burghduff, 2007 SD 7, ¶8, 727 NW2d 291, 294 (*Rotenberger I*) (quoting Chapman v. Chapman, 2006 SD 36, ¶11, 713 NW2d 572, 576). The courts must confine themselves to the language the

legislature used and cannot insert words into the statute that the legislature did not place there. Gloe v. Iowa Mut. Ins. Co., 2005 SD 29, ¶36, 694 NW2d 238, 250.

[¶29.]     While Bartlett reads the statute that the court may *only* consider a deviation when a party raises the issue, the statute does not say *only*. The statute says the court *shall* consider the deviation when the party raises the issue, but does not otherwise direct a court when it can or cannot hear an issue concerning deviation. Considering our long history of safeguarding the best interest of the child, it would be inconsistent to say a court cannot consider a deviation when a litigant, especially one appearing pro se, does not raise the issue during the hearing. *See* Dahl v. Dahl, 2007 SD 64, ¶21, 736 NW2d 803, 808 (striking down a mutual agreement to seek no child support and noting such an agreement was not in the child's best interest); Thomas v. Hauge, 2002 SD 12, ¶8, 639 NW2d 520, 521-22 (requiring noncustodial parent to pay child support on public policy grounds that require the protection of children despite an agreement between parents that waived child support in conformity with SDCL 25-7A-17); Estes v. Albers, 504 NW2d 607, 609 (SD 1993) (noting a support agreement that is detrimental to the best interest of the child violates public policy and is void); Vander Woude v. Vander Woude, 501 NW2d 361, 363 (SD 1993) (noting the parental obligation to support one's children is statutory and a matter of public policy); Stach v. Stach, 369 NW2d 132, 136 (SD 1985) (noting it is in the best interest of the child to be supported). Therefore, while a court "shall consider a deviation if a party raises the issue," a court may also consider a deviation sua sponte when it is in the best interest of the child, and the court makes specific findings regarding any of the factors in SDCL

27-5-6.10.[6]  *See* Brandriet v. Larsen, 442 NW2d 455, 462 (SD 1989) (noting that a "motion seeking amendment of the child support provision in the decree opened for examination *all aspects* of child support") (citing Brunick v. Brunick, 405 NW2d 633 (SD 1980)) (emphasis added); *see also* State *ex rel*. Struck v. Struck, 526 NW2d 500, 502 (SD 1995) (same); Grunewaldt v. Bisson, 494 NW2d 193, 195 (SD 1992) (same).

[¶30.]     Contrary to the majority opinion's assertions, *see supra* ¶19, the standard of best interest of the child has been used in conjunction with support obligations.  *See Dahl*, 2007 SD 64, ¶21, 736 NW2d at 808 (striking down a mutual agreement to seek no child support and noting such an agreement was not *in the*

---

6.    Moreover, the referee gave an example of what would result from adoption of the position urged by father in this case:

Example #1:  This Referee hears several modification petitions every year in which a father has committed a crime, becomes incarcerated, loses his job as a result and has zero income, or virtually none.  He then petitions for reduction of his child support obligation, and points out to the Referee that he has no income.  Usually the mothers do not appear at such hearings, because they are receiving no child support anyway and have no immediate prospect of doing so.  The Referee's practice has invariably been to impute to the father the income he lost as a result of his incarceration, usually with the result there is no change in circumstances.  The Referee then recommends dismissal of such petitions on the ground that the father's lack of income was the result of his voluntary act, even though that act was not accompanied by an intent to reduce his child support, *and even though the mother did not request deviation.*  Frequently these incarcerated fathers object to the Referee's recommendation.  In dozens of such objections over the years, no circuit court has overturned such a recommendation, even though no one requested deviation from the support schedule.  If the rule in South Dakota were that deviation could not be considered in the absence of a request by a party, hundreds of South Dakota children and mothers every year would see their support reduced to zero because the obligor committed a crime.  Many of these obligations, if unmodified, will at least continue to accrue as arrearages and eventually be paid, even if not paid today.

(Emphasis added).

*child's best interest*); *Estes*, 504 NW2d at 609 (noting a support agreement that *is detrimental to the best interest of the child* violates public policy and is void); *Stach*, 369 NW2d at 136 (noting it is in *the best interest of the child* to be supported). I agree with the majority opinion that the referee should not become an advocate for one party and with the remedy of canvassing the parties regarding deviations; however, the most important thing is that the referee gets it right. In other words, the referee must look out for the best interests of the child and ensure that the child's needs are supported, especially when the parties are pro se and may not understand the deviations offered or available. Therefore, even though it is unnecessary to reach the issue in the current case since the parties raised the issue of deviations, the referee would have the power to consider a deviation, despite the absence of a request by one of the parties.

[¶31.] Bartlett's second claim, one which the majority opinion largely changes to a different issue, is that the referee and circuit court erred when they deviated from the child support schedules. He argues that he cannot be held to his higher income when he did not quit his job in order to reduce his child support obligation, but quit in order to have a better quality of life. The referee found Bartlett voluntarily quit his former, higher paying job and took lower paying employment, but that he did not do so in order to reduce his child support. Even so, the referee determined the higher income should be used because quitting his job was a voluntary act. The referee interpreted the statute to mean that the act need not be for the purpose of reducing child support; it need only be undertaken voluntarily.

[¶32.] Instead of addressing solely the issue of whether a referee can deviate from the schedule when a reduction in income results from a voluntary change in employment, and not for the purpose of reducing child support obligation, the majority opinion addresses the procedure of arriving at the obligation when a referee deviates from the schedule. The majority opinion reaches this issue despite it never being raised by Bartlett. In fact, Bartlett declares that "imputation of income is a deviation." Furthermore, he expressly says a referee can implement a deviation by imputing former income and comparing it to the lower obligation and comments that "[p]robably no one is too concerned over whether the deviation value is itemized as . . . described." He does not argue that the referee does not have the power to assign the former higher income when deciding to deviate. Nor does he argue that a referee must follow the procedure outlined by the majority opinion. He simply argues that the deviation was not raised by either party.

[¶33.] Nonetheless, the majority opinion concludes that the referee erred when it imputed the higher, former income. The majority opinion does not conclude that the deviation was in error because the voluntary act that lowered Bartlett's income was not done to manipulate child support, as advocated by Bartlett. Instead, the majority opinion concludes the procedure was incorrectly followed and the referee's decision must be reversed because the lower income was not used to calculate child support first and then a deviation taken subsequent to the initial lower child support obligation.

[¶34.] The majority opinion argues that the "proper application of the statutes in this case would require calculating Bartlett's monthly net income based

on his actual earnings" and "[o]nly after this schedule calculation has been performed may a deviation, as set forth in SDCL 25-7-6.10, enter into the child support obligation equation." *Supra* ¶12. Therefore, the majority opinion claims that the referee "incorrectly applied the child support statutes by initially using the imputed prior income of Bartlett to calculate support[.]" *Supra* ¶24. However, this argument is contrary to our prior case law. *See* Woehl v. Woehl, 2002 SD 6, ¶15, 639 NW2d 188, 192 (no abuse of discretion in deviating from the child support schedule by using [obligor's] former income to calculate [the obligor's] current child support obligation).

[¶35.] In support of its argument, the majority opinion cites *Midzak*, 2005 SD 58, 697 NW2d 733, and *Gisi*, 2007 SD 39, 731 NW2d 223. It claims these cases stand for the proposition that a circuit court is required to calculate the current child support obligation from the current net monthly income and *then* deviate from the result. These cases do not support this proposition.

[¶36.] In *Midzak*, the circuit court gave custody of the couple's minor child to the father, but did not order any child support. 2005 SD 58, ¶11, 697 NW2d at 737. In reversing this decision, this Court stated that the parents' combined monthly net incomes shall be used to determine the obligation. Nevertheless, the later sentence in that paragraph explains that deviations from the support obligation schedule are possible, but must be raised by the parties in order to be considered. *Id.* ¶30. No party raised a deviation, and the circuit court did not make findings regarding a deviation. *Id.* ¶31. Therefore, we reversed the circuit court's failure to order child

support.  *Id.* ¶32.  We did not explain or require the *current* combined monthly net income to be used *prior* to deviating from the child support schedule.

[¶37.]        The majority opinion, citing *Gisi,* claims that we "require the trial court to calculate the monthly net income of the obligor *first . . .*"  *Supra* ¶13 (citing *Gisi,* 2007 SD 39, ¶8, 731 NW2d at 226) (emphasis added).  It goes on to state that "[o]*nly after* this calculation is made . . . may the deviations . . . be applied."  *Id.* (citing *Gisi,* 2007 SD 39, ¶11, 731 NW2d at 227) (emphasis added).  However, paragraph eight of *Gisi* requires a circuit court to use the monthly *net* income rather than monthly *gross* income.  *See* 2007 SD 39, ¶8, 731 NW2d at 226.  Furthermore, paragraph eleven explains a deviation is possible in certain circumstances, but not in *Gisi* because Lynette did not argue for a deviation exceeding the schedule and neither the referee nor the circuit court entered findings of fact supporting such deviation.  *Id.* ¶11.  No language in *Gisi* requires a circuit court to use the *current* monthly combined net income *first* and then apply the deviation.

[¶38.]        In contrast, we have case precedent that supports a referee or circuit court's decision to apply a deviation by imputing the former higher income when a parent has committed a voluntary act that reduces their income.  In *Woehl,* 2002 SD 6, 639 NW2d 188, we did not require the circuit court or referee to first determine the child support obligation based on the current monthly income and *then* consider the deviation.  Instead, we explained that because of his voluntary act that reduced his income, "there was no abuse of discretion in deviating from the child support

schedule *by using his former income to calculate his current child support obligation.*" *Id.* ¶15, 639 NW2d at 192 (emphasis added).[7]

[¶39.]    There is no support in the statute for the majority opinion's interpretation. It claims the statute requires the computation of child support based upon the current net monthly income and then a deviation from the result. However, the statute requires that "[t]he child support obligation shall be established in accordance with the following schedule *subject to such revisions or deviations as may be permitted pursuant to 25-7-6.1 to 25-7-6.18*[.]" SDCL 25-7-6.2 (emphasis added). The statute continues to explain that *"[e]xcept as provided in this chapter,* the combined monthly net incomes of both parents shall be used in determining the obligation. . . ." *Id.* (emphasis added). The statute does not direct the circuit court to set the obligation and then deviate.

[¶40.]    In any event, it seems that the majority opinion is preferring form over substance. In practice, the result will be the same. If a circuit court determines a deviation is warranted because of a party's voluntary act that lowered their income, the circuit court will most inevitably look at the prior income from which the income was lowered. It seems counterintuitive to set the obligation using current, monthly combined net income and then essentially "pick" a higher or lower obligation. There needs to be an objective basis for assigning an obligation. Imputing former, higher

---

7.    Like Bartlett, the father's child support obligation in *Gisi* exceeds fifty percent of his monthly net income. Under SDCL 25-7-6.10(2), there is a presumption that the obligation imposes a financial hardship on the obligor, but the referee or circuit court can consider the voluntary act that reduced the income. *See Gisi*, 2007 SD 39, ¶18, 731 NW2d at 229; *see also Woehl*, 2002 SD 6, ¶¶14-15, 639 NW2d at 191-92.

income to a party whose voluntarily act reduces their income provides a basis for assigning the obligation. For example, under the rationale of the majority opinion, the referee would be justified in first determining the obligation from the current income, next determining the obligation from the former, higher income and finally assigning the higher obligation based on the former income due to its finding that a deviation is warranted. The result is the same and the procedure is not only not mandatory, but unwarranted.

[¶41.] Finally, Bartlett claims that *Nauman v. Nauman*, 320 NW2d 519 (SD 1982), requires the voluntary action be for the purpose of reducing his child support.[8] Bartlett is correct that the case explains that one cannot voluntarily reduce one's income "in order to avoid alimony and support payments." However, *Nauman* does not declare that the lower income should be used to determine child support if the voluntary reduction of income is for a purpose other than reducing child support. The case was simply explaining that Nauman could not lower his income to reduce his child support.

[¶42.] Our statutes and our case law are contrary to Bartlett's argument. "It is a fundamental rule of statutory construction that the intention of the law is to be primarily ascertained from the language expressed in the statute." Huber v. Dep't of Pub. Safety, 2006 SD 96, ¶14, 724 NW2d 175, 179 (additional citations omitted).

---

8. Bartlett emphasizes he quit his job in Huron near his children because working at the funeral home was highly stressful and he was "burn[ed] out." However, the referee, who heard his testimony, found the "true motivation appears to be his decision to remarry, to a woman who lives in the Harrisburg area."

The statute provides that a "deviation from the schedule . . . shall be . . . made only upon the entry of specific findings based upon . . . [t]he voluntary act of either parent which reduces that parent's income." SDCL 25-7-6.10. The statute provides the act must be voluntary but does not require it to be for the purpose of reducing child support.

[¶43.]     Furthermore, our case law does not require the act be for the purpose of reducing child support.[9]  In *Kost v. Kost*, we imputed minimum wage income to the mother when she voluntarily reduced her income to return to school. 515 NW2d 209, 214-15 (SD 1994).[10]  In doing so, this Court explained that the duty of a parent to support his or her child is *paramount* and the child's interest is the *primary consideration*. *Id.* at 214. We noted that "the first obligation of any parent is to

---

9.     Iowa has refused to modify a support obligation when the reduction of income is voluntary and self-inflicted. *See In re* Marriage of Walters, 575 NW2d 739, 741-42 (Iowa 1998) (citing generally *In re* Marriage of Dawson, 467 NW2d 271, 275-76 (Iowa 1991) (refusing to reduce child support obligation for obligor who quit job to finish education and take a job with lower pay); *In re* Marriage of Vetternack, 334 NW2d 761, 763 (Iowa 1983) (court unwilling to modify obligation for obligor who committed felony and was incarcerated but who had equity in home from which obligation could be satisfied); Ellis v. Ellis, 262 NW2d 265, 267-68 (Iowa 1978) (finding obligor's voluntary retirement at time when he still had substantial earning capacity to be voluntary and self-inflicted); Reed v. Reed,152 NW2d 190, 191 (Iowa 1967) (refusing to modify support obligation when obligor voluntarily quit job to return to school); *In re* Marriage of Bales, 439 NW2d 228, 230 (IowaCtApp 1989) (declining to modify obligation when obligor quit job paying $15,000 per year to take job paying $5,900 per year).

10.    While this imputation of minimum wage was done in *Kost* under SDCL 25-7-6.4, citing SDCL 25-7-6.10, we noted that the lower court could have deviated by virtue of Karen's voluntary act which reduced her income. *Id.* at 215. Her former income before going back to school would have been minimum wage because she was not working during the marriage or prior to going back to school. *Id.* at 211.

provide child support, assuming he is physically and mentally capable. To hold otherwise would be to open the floodgates and allow parents who have child support obligations to circumvent these obligations under the guise of returning to school to enhance employment." *Id.* at 215.

[¶44.]        I agree with the conclusion that imputation of former, higher income is not automatic if the obligor commits a voluntary act which reduces his or her income. Indeed, the real problem in this case is it appears that the referee incorrectly assumed that it had no choice but to impute Bartlett's higher income once it determined there was a voluntary act that allowed for a deviation under SDCL 25-7-6.10.[11] The statute requires the deviation to be *considered*, but does not mandate deviation. *See* SDCL 25-7-6.10 ("Deviation from the schedule in § 25-7-6.2 shall be *considered* . . .") (emphasis added). Where I part ways with the majority opinion on this issue is that a child support referee may, in its discretion, impute the former, higher income to the obligor under SDCL 25-7-6.10(6). Absent an abuse of discretion, the decision whether or not to impute the former, higher income as a deviation would stand.

---

11.    The majority opinion also suggests the referee's findings were inadequate to support the imposed deviation. However, in the referee report upon remand, the conclusions of law also note that "Melissa . . . due to Lee's unilateral reduction of his support payments . . . is already in arrears in her rent payment." I would submit that this supports the referee's implementation of a deviation.

Moreover, the majority opinion suggests that the referee simply imputed the higher income and did not consider the imputed higher income as a deviation. I agree the initial referee report does not use the word deviation and specifically finds that Bartlett waived his requested deviation. However, in

(continued . . .)

[¶45.]     Because Bartlett's actions were voluntary and the reduction of income was self-imposed, the court did not err when it recognized it could deviate from the child support schedule and impute Bartlett's former, higher salary to determine his support obligation.  However, the language in the referee's report indicates it considered the imputation of the former, higher income mandatory.  On the contrary, the referee or circuit court has *discretion* to deviate if the income is lowered by a voluntary act, but the imputation of the higher income is not *mandatory*.  Therefore, I agree in result since the case should be remanded in order for the referee to consider the discretionary deviations.  I dissent because the referee need not follow the procedure outlined by the majority opinion.  As long as the deviation is supported, the procedure should not matter.

_____

(. . . continued)
> the report of referee upon remand, the issue of deviation and the power to raise it sua sponte was addressed as a specific issue.